ESTATE AND GUARDIANSHIP OF GAGE H. MOXEY, AN INCOMPETENT PERSON.

[No. 27,338; decided March 6, 1903.]

Guardian of Incompetent—Matters for Consideration in Appointing. In proceedings for the appointment of a guardian for an alleged incompetent and for her estate, the opinion of an alienist as to her mental condition over sixteen years before, when he visited her in a social way and conversed with her, is not too remote for consideration, because in such cases the personal history of the subject and her heredity, temperament and diathesis, are taken into account to enable an intelligent appreciation to be had by the investigator, whose judgment must be instructed as to effect or defect by searching for cause, however far back it may seem necessary to trace it. The concern of the court, however, is not with the condition of the alleged incompetent at such previous time, but with her status as to competency of mind at the date of the application for guardianship and at the

time of transactions therein referred to as conceived in fraud with a view to impose upon her and obtain her property through her mental weakness.

**Guardian of Incompetent—Nature of Proceedings to Appoint.—**A proceeding for the appointment of a guardian for an incompetent person and for his estate, as provided by section 1763 of the Code of Civil Procedure, is not an inquisition in lunacy, but an inquiry as to mental competency to manage one's property.

**Insane Persons Distinguished from Incompetent Persons.—**"Insane" and "incompetent" are not necessarily convertible terms; a person may be incompetent by reason of insanity, or from some other cause incapable of caring for his property.

**Guardian of Incompetent—Jurisdiction of Court to Appoint.—**Whatever doubt existed in former times as to the authority of courts to appoint guardians for incompetent persons, as distinguished from persons actually insane, is now removed in this state by the explicit language of the statute, conferring jurisdiction in this class of cases, and making it the peculiar province of this tribunal to protect any person proved to be within the purview of the statute.

**Guardian of Incompetent—Matters for Consideration in Appointing.** In determining whether a guardian should be appointed for an alleged incompetent woman, it is important to consider the value and character of her property, the persons by whom she is and has been surrounded, and whether they are not seeking to profit by her mental weakness and to obtain advantages which in other circumstances she might resist, and also whether she has in fact been overreached and imposed upon, and is in the exclusive control and keeping of persons who have acquired absolute dominion over her and deceived her to their own gain.

**Betrothed Persons—Business Transactions Between.—**The relations of betrothed persons being of an extremely confidential character, the law imposes, in case of business transactions between them, the utmost circumspection and care to forefend fraud. If the woman is about to convey property to the man, he should see that she has the assistance of a competent attorney.

**Betrothed Persons—Conveyances Between—Suggestions of Fraud.—**The fact that a deed from a woman to her fiancé purports to be based on a pecuniary consideration, when in fact there is none, is a strongly suspicious circumstance, particularly when she is suspected of mental weakness.

**Betrothed Persons — Conveyances Between — Secrecy.—**Where a woman, suspected of mental weakness, gratuitously conveys property to the man to whom she is betrothed, the fact that the deed is prepared and executed in haste; that the gift is excessive; that there is lack of opportunity for calm consideration and reflection; that the deed recites a money consideration, and a covenant of warranty and

an agreement to furnish an abstract up to date; that the grantee virtually dictated or supervised the making of the deed, while his intimate friend and associate prepared the instrument; and that the grantee is admitted to have influence over the grantor, through her fatuous fondness for him—all these are circumstances strongly suggestive of fraud.

**Marriage—Mercenary Alliances not Favored.**—Mercenary marriages are abhorred in equity, and not favored otherwise where the surroundings point to an unworthy motive, and the conduct of the party who is pecuniarily benefited suggests insincerity or bad faith, and indicates that he has taken an undue advantage of the other's weakness of will or confidence in him, springing from intimacy of relation.

**Marriage—Duty to Make Public.**—When parties are married, though ceremonially, it is their duty to themselves and their obligation to the State to follow up the rite by living together as husband and wife and affording public evidence of that relation. So far as the immediate interest involved is concerned, it matters little compared with the interests of organized society.

**Marriage—Publicity—Nature and Sanctity of Institution.**—Marriage is more than a contract; it is a status; it is an institution of society and its foundation; it does not come from society, but contrariwise; it is the parent of society, and it is extremely important that its stability shall be secured, and that its contraction should be surrounded by safeguards and its sanctity upheld; and every solemnization of marriage should be in the face of the public; there should be no secrecy either in ceremony or in connubiation.

**Mental Incompetency—Sudden Change of Affections.**—Sudden and groundless suspicions of the affection and fidelity of tried and trusted relatives and friends are common symptoms of unsoundness of mind, and so are hastily conceived affections for and confidences in mere strangers and newly made acquaintances.

**Mental Competency—Value of Opinion Evidence.**—The opinion of witnesses as to the soundness of mind of a person sought to be put under guardianship as an incompetent are not entitled to so much weight as facts, especially when conflicting; for when a fact is established, it is a fact and cannot be overcome, while an opinion is but an opinion, and it may be true or false in its inference.

**Guardian of Incompetent—When Should be Appointed.**—The claim of the petitioner in this case that the respondent is incompetent, that she is incapable of taking care of herself and her property, and that she is likely to be imposed upon by designing and artful persons, is held by the court upon an examination of the evidence, to be fully made out, and the petition for the appointment of a guardian of her person and estate is granted.

Application for letters of guardianship..

Bishop, Wheeler & Hoefler, L. M. Hoefler, William Rix, C. W. Cobb and E. M. Rea, for applicant, Harry Lester Mandeville.

Irwin J. Truman, Jr., F. S. Oliver, S. V. Costello, for respondent, Gage H. Moxey, otherwise Gage H. Phillips.

COFFEY, J. The applicant is the son in law of the respondent, whom he charges with incompetency under the statute, alleging that she is over the age of fifty-six years, a resident of San Francisco, and mentally incompetent to manage her property, and that by reason of disease and weakness of mind she is unable unassisted to properly manage and care for herself and her property, and by reason thereof would be likely to be deceived and imposed upon by artful and designing persons, and that she has been so deceived and imposed upon by certain persons named answering that description. The circumstances recited in support of this allegation are that some time prior to the month of May, 1902, respondent was the owner of a redwood timber ranch in Mendocino county, two thousand four hundred acres in area, worth about $24,000, and also a parcel of land and improvements thereon in Boston, Massachusetts, valued at $200,000; she being then a resident of San Francisco as an unmarried woman, being the divorced wife of one Harrison F. Hawkes; that at about this time she met one John D. Hoover, who was conducting an establishment in this city known as the Hoover University of Physical Culture, and in whose employ was one Oliver N. Moxey, an unmarried man, twenty-six years of age, these two persons having classes for the teaching of physical culture and being the professors in the institution mentioned; that respondent undertook to receive instruction therein, and in that way she made their acquaintance; that they, learning of her mental weakness and material wealth, with design of defrauding her, and by deceiving and imposing upon her to acquire her property, conspired, confederated and combined in that behalf; and, in the execution of their purpose, it was agreed upon between them that Moxey should pretend to pay his attention to her with the view of marriage, and that he should induce her to voluntarily con-

vey to him as a gift said real property; that, in pursuance of said plan and scheme, on or about the 23d of May, 1902, Moxey having become engaged to marry respondent, induced and persuaded her to deed over to him without consideration the Mendocino ranch, and that he caused to be prepared a certain deed of that date conveying to him said property for the purported consideration of $10, although in fact no money or other good consideration whatever passed from said Moxey to her, and that thereupon Moxey caused a deed of said premises to be recorded in Mendocino county, and thereafter exercised full dominion over the property and shortly afterward mortgaged the same for $5,000, which he appropriated to his own use; and that subsequently, and in furtherance of their common plot and project, Hoover, in his own hand, prepared a deed of the Boston property purporting to convey the same from respondent to Moxey in consideration of $20, although in truth no actual consideration whatever passed between them; that this deed was so prepared by Hoover, who accompanied Moxey and respondent to the office of a notary, where she, acting under the influence and control of Hoover and Moxey, signed and acknowledged a deed to said property and delivered it to Hoover; that afterward and on the same day Moxey accompanied respondent to San Jose and there, before a justice of the peace, was married to her, and, it is averred by applicant here, that this ceremony was celebrated and consummated solely for the purpose of perfecting the scheme concocted between him and Hoover to obtain her property and the whole thereof that was subject to her control. After the marriage Hoover took the last-mentioned deed to Boston and caused the same to be recorded. During the period from the first acquaintance of the respondent with Hoover and Moxey the former actively promoted the pretended suit of the latter for her hand by impressing upon her the great love and affection which the said Moxey professed for her, and they both sought to impress upon her mind the great advantage of a marriage with Moxey. The result of the sinister scheming and mutual machinations of these two men was the securing of the deeds and the procuring of the marriage as related.

Such is the situation in epitome as described in the applicant's petition.

It is not the case of an alleged lunatic, within the legal meaning of the term, or of a person who sometimes has understanding and sometimes not; although it is in evidence that respondent spent five years as a patient in a sanitarium or private hospital for mental diseases in Brookline, Massachusetts, from 1881 to 1886, committed thereto by a magistrate upon physician's certificate, at which time she was thirty-four years old and the mother of one child; she herself testifies that she went to this institution voluntarily, because she had peritonitis and uterine trouble and sought rest and treatment under the care of her friend, Dr. Channing, the superintendent of this retreat or home for persons suffering from nervous disorders. This doctor was not allowed by the court to testify as to her condition mentally or her acts while in his charge, but another physician, Dr. Jelly, of Boston, an alienist of experience, chairman of the Massachusetts State Board of Insanity and supervisor of all the insane hospitals in the state, and examiner in insanity in Suffolk county, was permitted to give in evidence the result of his observation when he saw her in a social way several times during her sojourn in the sanitarium, and he relates that on one occasion shortly before her release he had quite a conversation with her about herself; he was familiar with her history, and he took great interest in her because she was suffering very much, and he and Dr. Channing thought it was a case that ought to get well, and the two physicians talked it over many times, but his own calls at the asylum were social and he did not there visit her as a patient; her mental malady was acute suicidal melancholia, and this condition might have arisen without any physical ailment and it might have been caused by bodily illness; but he had not seen her in nearly twenty years.

It is objected that this testimony is too remote for consideration in this inquiry; but in such cases personal history of the subject and her hereditary, temperament and diathesis are taken into account to enable an intelligent appreciation to be had by the investigator, whose judgment must be instructed as to effect or defect by searching for cause, howsoever far back it may seem necessary to trace it. What alienists denominate the etiology of the case is of value in reaching a conclusion, where mere casual observation of a condition so obscure in its

diagnosis at times would be without avail. The evidence in this record as to family history is meager, but enough appears to show that several members of it were subject to mental infirmities. Whether or not at this distance of time there are any sequelae surviving of the distemper which caused her confinement in the sanitarium is difficult to determine. The concern of this court, however, is not with her condition in the period indicated, the lustrum of 1881-86, but with her status as to competency of mind at the date of the application and at the times of the transactions therein referred to as conceived in fraud with a view to impose upon her and obtain her property through her mental weakness.

This is not an inquisition in lunacy, but an inquiry as to mental competency to manage one's property. "Insane" and "incompetent" are not necessarily convertible terms. A person may be incompetent by reason of insanity, or from some other cause incapable of caring for his property. The statute speaks of the "insane or incompetent" person and is here quoted at length:

"When it is represented to the superior court, or a judge thereof, upon verified petition of any relative or friend that any person resident of the county is insane, or from any cause mentally incompetent to manage his property, such court or judge must cause a notice to be given the supposed insane or incompetent person of the time and place of hearing the case, not less than five days before the time so appointed; and such person, if able to attend, must be produced on the hearing": Code Civ. Proc., sec. 1763.

A subsequent section undertakes to define the terms used by declaring that the phrase "incompetent," "mentally incompetent," and "incapable," shall be construed to mean any person who, though not insane, is, by reason of old age, disease, weakness of mind, or from any other cause, unable, unassisted, to properly manage and take care of himself or his property, and by reason thereof would be likely to be deceived or imposed upon by artful or designing persons: Code Civ. Proc., sec. 1767.

The intention is plainly benevolent in the expression of this statute, and it is not too laudatory of the law to say that it represents the most advanced and enlightened legislation upon

this subject so far enacted. At the common law the persons included within the terms of the declaratory section were without relief, and it was only by the beneficent assumption by courts of chancery of jurisdiction and their wise application and adaptation of the general principles of justice and humanity to the case in hand that a remedy was obtained, but, until the progress of legislation made the matter certain, the exercise of equitable jurisdiction was engaged in timorously.

In the Matter of Barker, 2 John. Ch. 232, the great Chancellor Kent said that the difficulty which arose with him was as to the extent of his jurisdiction, for the suggestion was that the respondent's mind was so worn out by old age so as to render him incapable of managing his property, and that thereby he stood in absolute need of the protection of the court against his own acts, and against the practices of evil and designing men, and the chancellor remarked that the case as stated was deeply interesting to humanity, and presented a strong appeal to the powers and justice of the court, but he had misgivings as to his authority to interfere in the premises, for mere imbecility of mind, not amounting to idiocy or lunacy, had not until a then very recent date (1816) been considered in England· as justifying an interference with the liberty of a person over himself and property. Indeed, prior to the Revolution no case had gone so far. Lord Hardwicke disclaimed any authority over mere weakness of mind, yet Kent thought it certain that when a person became mentally disabled, from whatever cause the disability might have arisen, he was equally a fit and necessary object of guardianship and protection, and the court of chancery was the constitutional and appropriate tribunal to take care of those who were incompetent to take care of themselves, and without such a power, there would be a deplorable failure of justice. The object is protection to the helpless, and no matter what causes the condition, sickness, vice, casualty or old age, when it is evident to the court that the person is reduced to mental weakness and disqualified for the ordinary management of his affairs, it becomes a case for equitable interposition and is within the reason and necessity of the trust. The inquiry is, however, peculiarly delicate, in most cases, because it concerns the character of the party, and his natural rights, and

because of the difficulty there is in ascertaining the extent of the decay of the mind as a basis for judgment. Whatever doubt existed in the minds in former times as to the jurisdiction of the courts is now removed by the explicit language of the law conferring jurisdiction in this class of cases, making it the peculiar province of this tribunal to protect any person proved to be within the purview of the statute. Is the respondent proved to be such a person? Is she in that class of persons whose minds have become weak, though not insane, by reason of age, disease, or any other cause, and who would, in that case, be left without protection and liable to become the victims of folly and fraud? It is urged here by her counsel that no case has been made out against her because she has not been shown to be so far debilitated in mind as not to be equal to the general management of her own affairs, and that, in the language of Lord Erskine, she is competent to common purposes. What are the affairs to the management of which she is incompetent? Those affairs may be of such a nature that a certain degree of impairment of memory may render her incompetent to their management, and yet she may not be of unsound mind. It is not actual insanity, it is repeated, that is here in question, but it calls as strongly for the protection of the court, not only in the interest of the individuals affected, but as it concerns the state in the prevention of wrong to citizens and the conservation of the rights of person and property. This is the primary purpose of the proceeding. The public ends to be served are the protection of property, the prevention of fraud, and the providing against the incurment of a public charge by consequence of improvidence inducing indigence. Thus it will be seen that not only is the welfare of respondent involved, but the general interest of the community of which she is a component is implied.

It is important, in this inquiry, to consider the value and character of the property belonging to the respondent, and also to regard the persons by whom she is and has been surrounded, and whether they are not seeking to profit by her mental weakness and to obtain advantages which in other circumstances she might resist; and it is furthermore important to ascertain whether or not the alleged incompetent has in fact been overreached and imposed upon, and whether she

is in the exclusive control and keeping of persons who have acquired absolute dominion over her and deceived her to their own gain. It is claimed that she has been victimized owing to her infirmity, and that the transactions in themselves and their circumstances establish her incompetency, and that through her own folly and the fraud of the persons named in the petition she has been deprived of her entire property and effects to their enrichment, and that this was the result of a conspiracy concocted by them.

The property over which respondent had power of disposition, and which she transferred by deeds to Moxey, is estimated to be worth over $200,000, consisting of valuable lands in California and town property in Boston, improved city lots well rented. Respondent gave this property to Professor Moxey, to use her own words, because she loved him. The timber lands were deeded to him after her engagement and before their marriage, and the Boston lots on the day of that event, but prior to the ceremony. The recipient of this token of affection she first met in January, 1902, at Hoover Hall, a school of physical culture, where she was introduced to him by one of the class in which she was taking instruction and where he was an instructor. She was then about fifty-five years of age, born in 1847; he was about twenty-nine, born in 1873—a disparity of about twenty-seven years. In a short time the teacher became attentive to his pupil, and in the space of less than a month, on the 22d of February, 1902, while they were out at the ocean beach, sitting on the sand, they became betrothed. She had been married before, when she was twenty-two or twenty-three years old, to one Harrison F. Hawkes, with whom she lived for about twenty-one years and from whom she was divorced in 1894 in California by default; she came here for the purpose of obtaining a legal separation, leaving her husband behind without information as to her intention; she had been in this state prior to that time, and, indeed, was an extensive traveler, having, after her residence in the Channing Home in 1886, spent a year in a tour of Europe and Egypt and subsequently crossing the continent to the Pacific coast on her own account. Besides the property mentioned she has a life interest in a trust created by her

mother, the principal on her own decease to go to her daughter, her two brothers, David and Leonard, being the trustees.

Mr. Moxey was a bachelor at the time of the betrothal, and had no means save his income from his occupation or profession as a physiculturist. His own story of his struggles and success is not an unusual recital. Born in England, he spent there the greater part of his youth—at school from five to fifteen years of age and then working on a farm until coming to America, when seventeen; hiring out as a farm hand for about two years until he started for this state, and, on reaching here, engaging at first in farming in Santa Cruz county and continuing thereat for about six months; after that he spent about two months in San Benito county, thence to San Jose on an initial visit, where he remained two or three months; he was not employed at anything worth remembering during this interval, but upon leaving San Jose he went to work for the railroad company all along the Coast Division for about twelve months, when he undertook a scholastic course at the Garden City Business College, pursuing his purpose in that institution for about two years, going thence to a clerkship in the freight office of that city for several months; after that he was engaged in book canvassing in various towns and soliciting for commercial orders, for a health food under the auspices of the Hoover Health Club, and he assisted Mr. Hoover in the way of physical culture at first in San Jose, and, finally, he brought up in San Francisco about three years since in the employ of Mr. Hoover as a teacher of physical culture in what is called the Hoover University of Physical Culture, at 1319 to 1327 Market street. It was in this place while so occupied that he met respondent some time in January, 1902, when he was introduced to her by a Mrs. Shipman, to whom he had introduced himself at an earlier hour on the same day in the same hall. Respondent joined his class and took lessons several times a week, coming to the hall every day, sometimes twice a day, and the two increased in the intimacy of their acquaintance until their engagement, which occurred on Washington's Birthday. The day was not set at that time for the ceremony, but subsequently, about six weeks or two months prior to that date, July 14th was agreed upon for the event. Mr. Moxey is not an adept in dates; he himself says

that his memory is very poor in that particular—many important events in his life he cannot remember as to date; but these two items of interest are indelibly impressed upon his mind, the dates of his betrothal and espousal. At the time of their first meeting he was acting as chief instructor for Mr. Hoover, and here it may be important to note that the latter named gentleman testified that during his absence from the classrooms his place was filled by Professor Moxey, and that he was absent therefrom from January to June, 1902, having been injured by a street-car accident in December, 1901. He went to Colorado to the home of his parents a few days before Christmas, and returning to his room here remained there convalescing from January to June 2, 1902, rarely going outside, and virtually abandoning all affairs of business until the latter date, when, venturing into his physical culture school, he met respondent near the entrance to the hall, near the stairway, and he was introduced to her by a Mrs. Ruthie, one of his pupils, as Mrs. Phillips. The latter was at a distance and his pupil said to him: "Don't you know who that lady is standing there?" Hoover replied that he did not, whereupon Mrs. Ruthie remarked: "That is Professor Moxey's sweetheart; everyone in the class knows that." He did not know, because he had not been attending the class for so many months, Moxey being on duty in his stead. Before that date, June 2, 1902, Hoover swears he had never seen respondent. Respondent herself on her first examination stated that she did not meet Hoover until the last of May or the first of June, 1902, although she might have talked to him over the telephone in the middle of May, 1902. It was sometime in May, she said, she first met him; he had been ill. Later on in the course of the trial she swore positively that she first saw him on the 2d of June, 1902. This testimony is in conflict with that of Mrs. Mary Turman, styled Dr. Turman, a quondam teacher in the school, and a former pupil of Professor Hoover, whom she had known for several years, and in whose institute, she says, she took lessons regularly in the month of April, 1902. She had an office in the same building. In that month she met him in the schoolroom and also saw respondent there; he asked this lady doctor if she had met Mrs. Phillips, and she said "No." He pointed out a lady on the floor and said that

she was a wealthy woman and told her to ask Mrs. Patten, his private secretary, to effect an introduction. Professor Hoover said that Mrs. Phillips was a friend of Professor Moxey's and was in love with him. Respondent was present in the schoolroom at the time Hoover said this to Mrs. Turman, but was not within hearing. Hoover further said that Mrs. Phillips had proposed to Moxey; immediately after this conversation Mrs. Turman was introduced to respondent.

Professor Hoover denies absolutely and in detail this statement, but admits that he spoke to Mrs. Turman of a Mrs. Phillips, another person, a wealthy woman living on Van Ness avenue, near St. Luke's church, whom it was desirable to secure for a pupil. He says that he was not in the classroom or hall while any part of the exercises was in progress during the period of January to June 2, 1902, although he had his private office in the building and received the accounts there, and occupied apartments where he dwelt in the same edifice, but he attended to very little business connected with the institute and did not know who composed the class and rarely visited the hall itself.

In comparing these statements there is an element of probability in that made by Mrs. Turman, arising from the admission of Mr. Hoover and from the circumstance of his proximity to the place and person whom the conversation concerned. Hoover admits enough to throw doubt upon his denial of the substance of the story, which in itself is circumstantially probable. His statement that he did not know the names of the members of his school at that time may be consistent with his position as the head of the institution, but it seems he knew some and was presumed by Mrs. Ruthie, his pupil, to be acquainted with all, as is inferable from her surprise that he did not know what everyone in the class knew— that is, that Mrs. Phillips was Moxey's sweetheart. The other Mrs. Phillips, to whom he alludes, as being desirous of securing as a pupil, is rather nebulous, except as her points of age and wealth and interest in physical culture coincide with the respondent. It seems, from what he says, that Mr. Hoover did give to Mrs. Turman names of persons to call on who were interested in his science, and that he preferred pupils of the description which embraced both this respondent and her

namesake. The importance of this testimony is primarily that it either implicates or exculpates Hoover in the alleged conspiracy to obtain the property of the respondent, comprising transactions dated as far back at least as May 23d, 1902, when the deed to the Mendocino property was executed, and his denial, if true, being equivalent to the establishment of an alibi, originally carried the inference that at the time laid in the accusation he was in another place, and that it was impossible for him to have met her prior to the 2d of June, 1902, because of his physical infirmity and necessary confinement to his room and absence from his classes during the year 1902 up to that date. That it was not impossible may be seen by an examination of his own evidence, from which it appears that he was out of his room almost every day, sometimes for half an hour at a time or an hour, and that he occasionally went to his private office and to the institute to talk business, and that he was in the City Hall as a witness twice in May, on the 7th and 27th of that month.

It was close to this time, to wit, on May 23d, 1902, that the redwood transaction took place. As to the first deed, she says it occurred this way: She and Moxey were lunching at the Techau Tavern when she said to him, "I am going to deed my redwoods to you to-day." She had not previously communicated her intention to him; she had said nothing to him at all on that subject, although she had been thinking about it; it was a surprise to him and so intended by her; this was about the hour of noon; immediately after luncheon they went to the law office of Mr. Delmas, a lawyer whom neither of them knew, except as everyone knows him because of his eminence in his profession, to seek his services to draw this deed, and there in that office in the Call building a young man was found alone, whom Moxey asked to make out the paper. She did not know whether this young gentleman was Mr. Delmas or his clerk; no introduction took place; no recognition was had, for neither knew the other. Moxey entered and simply said, "I want you to make out a deed," and the gentleman consented. Then she said, "I am going out; after the deed is made out I will come back and sign it," and she went out, remaining away about an hour, then returned and signed it and then went downstairs and acknowledged it before a notary in the same

building, in which the Columbian Bank is situated; the deed
was recorded in Ukiah; but another document had to be drawn
there because the first was faulty; McNab and Hirsch were the
attorneys in Ukiah; this second deed was made in June or
July, while she was at Ukiah; her memory was very vague
about the circumstances of the making of the second deed;
Moxey was there; she was not certain which of the firm of at-
torneys drew the instrument; she went there one day with
Moxey; she did not think she knew anything about that deed
being made, did not remember it being changed; knew it was
altered because the first was not made out right; did not go
before the notary again; did not think she had signed any
other paper; had no recollection on that score; could not recall
having been before a notary in Ukiah; did not know the deed
was made over entirely, but knew it was changed; did not re-
member acknowledging the document before Mr. Hirsch, the
notary; she thought it was somewhere about the 1st of July,
1902, that the deed was altered—upon these points her mem-
ory was very uncertain and treacherous; indeed, it may be
said that she had no memory of the circumstances, and that
her description of what took place is unreliable to an extent
casting doubt upon her competency. Although she had been
the owner of the Mendocino property for twenty years, her
estimate of its value was much below that of others conversant
with such lands, several thousands of dollars less.

As to her narrative of what transpired when she told Moxey
of her purpose to present him with this valuable estate in tim-
ber lands, it is worth while to compare his version with hers.
Moxey relates that they were at lunch at the Techau Tavern
when she said she was going to give him the redwoods; they
had been speaking about these redwoods—about the tan-bark—
and she said she was going to give it to him that day, May 23,
1902; he had previously seen the land, and had gone up there
at her instance in regard to cutting the tan-bark, and, she ex-
plained afterward, she wanted to see how he would like the
redwoods, he meant the tan-bark. After lunch they went to
the office of Mr. Delmas and had the deed made out; it was
signed in that office. When he went in he asked the gentle-
man if he could make out a deed to some property and he
said he could do so. Moxey had the description of the prop-

erty with him; he had obtained it from respondent at the Tavern. He did not remain in the office while the attorney was drawing the deed; he went out and was gone for nearly an hour; the lawyer said it would take an hour to draw it and Moxey retired from the room—respondent went out first alone and he afterward; where he went he could not remember and he did not know where she had gone in the interval. He returned, the deed was executed, and he transmitted it to Ukiah for record. Another document was drawn later on in Ukiah in the office of McNab and Hirsch. There was tan-bark cut on this land, about six hundred cords, for which he had a contract for sale, at $17 per cord, but all of it was not delivered because it did not come up to the contract. This was on account of the trouble had with men cutting it and himself being taken away from the work through the lawsuits instituted against him by Boston parties, including an attachment levied here for $12,000.

It would appear from this that Moxey's mind was in a receptive condition for the surprise so suddenly sprung upon him by her at luncheon, as she had some time before sent him up to the redwoods to see how he would like them; and it appears, also, from the testimony in this controversy that two days before he was so surprised he called on William Thomas, who had been the attorney for respondent, to inquire in regard to the condition and value of her Mendocino property; this was on May 21, 1902. Thomas asked Moxey what he could tell him about it, and Moxey said he would like to know what it was worth. Thomas asked him if he was a purchaser of the property or contemplated purchasing; he replied no, that he was a friend of Mrs. Phillips and wanted to handle it. Thomas told him that he did not know the value of the lands, as the matter was in charge of Mr. Smith, an attorney, clerk in the office, but that he had been assured that the tract was some of the most valuable redwoods in the state, but he could not give an exact idea as to the valuation. Moxey then asked Thomas to show him some of the papers, which he said, "I understand are in your office." Thomas asked, "What papers?" Moxey said, "I would like to see the description of the property, the map, and tax receipts." Thomas replied that before he could accede to this request he would require

an order from Mrs. Phillips and upon the production of such a memorandum he would instruct his clerk to devote all the time necessary to him. It is curious that if Moxey had no precognition of the purpose of respondent he should have been so inquisitive in advance of her declaration at the Techau Tavern luncheon. The interview between Thomas and Moxey was rather heated, because the former resented the manner of the latter's intrusion into his office, and this may, in part, account for avoiding further intercourse with that lawyer and choosing a strange attorney, for it was Moxey that conducted respondent to the office of Mr. Delmas and selected a gentleman utterly unknown to him and to her, and there caused an instrument to be prepared in such haste, that the description was so fatally defective as to render necessary a second deed before a loan could be negotiated thereon. If respondent controlled the situation and had mastery over her own volition at the time, it should seem remarkable that she would deliberately adopt a course of action in a matter of such magnitude as to consult a stranger and ignore her own legal adviser, Mr. Thomas, whose office was but a short distance further down-town, where full information and complete data were accessible, and competent advice was at hand, and where a perfect conveyance could be prepared and all the details of execution accurately adjusted; and where, moreover, she could have the advantage of independent counsel as to her action. In and by very virtue of his relation to her as his betrothed, Moxey should have seen that she was so provided where he was to be the sole beneficiary of the transaction. Their relations were of an extremely confidential character, and the law imposes in such cases the utmost circumspection and care to forefend fraud. Mr. Moxey testified that he had no knowledge of respondent's intention to donate the redwoods to him until the luncheon, and that she told him she was going to give it to him because she loved him and wanted him to have it, and they happened to go to Mr. Delmas' office because she suggested that gentleman's name and did not mention Mr. Thomas, and that she furnished a typewritten description of the land, which he never saw before, and that he knew nothing about the extent or value of the property before the deed was drawn

and had made no inquiries on this subject. In respect to this statement, his visit to and interview with Mr. Thomas may be worthy of consideration as hereinabove narrated. It cannot be doubted on this record that he had made inquiries in the quarter where information was lodged, and that his endeavors were not successful at the time. Respondent's description of the circumstances of the making of the redwoods deed is calculated to suggest that she was deficient in business sense, or so subject to the control of Moxey by reason of her infatuation for him that she was destitute for the time of ordinary powers of memory and reflection; she left the whole matter to Moxey; she did not request the deed to be made; he did that; she did not know that she said anything, he might have said that he could do the business as well as she could, perhaps better, so she got him to do it; she gave him the tax receipt; she did not know Delmas; Moxey did not ask the lawyer's name, she could not remember the notary; she was sure she went downstairs two floors to acknowledge the deed, whereas the notary's office was one flight higher; her memory was a medley upon the details of the making of the first deed; when she went out of Delmas' office while the young man was engaged in the operation she remained away for some time and upon her return she lost her way and could not find the place; she went to different floors, found it finally; she was very much confused in her recollection of these matters, and so far as appears from her recital she acted in a manner mechanically or automatically; she gave no instructions to the draftsman of the document; said nothing while in his office; Moxey did all the talking and paid the attorney for his services. Throughout all this performance Moxey was the dominant factor and principal actor—indeed the only one, as she but played the part of a puppet in his hands; and he did not wait long to realize upon this act, for within a week or two, when the imperfection of the first deed was cured, he secured a loan of $5,000 from the Bank of Ukiah; besides which he received over $6,000 on a contract for tan-bark, which was abandoned because after nearly four hundred cords had been delivered, the purchaser found it was not up to standard; the buyer testified that he paid some of the purchase money to Moxey and some to Hoover. Moxey testified that he spent all of the money, and

more, too, on the tan-bark, which turned out to be an unprofitable venture because of the lawsuits brought against him—that is to say, he expended more than $11,000 on the tan-bark proposition, which would have been profitable if he were not interfered with by litigation.

Where the excess expended came from does not appear in this record. Respondent herself testified that she raised $10,-000 last year (1902) from January 1st to September 1st, all of which had been spent by the latter date, $5,000 by her husband in cutting the tan-bark and $5,000 she had consumed on herself, and she never gave Moxey a dollar before their marriage, which took place on the 14th of July, 1902, in the afternoon, in San Jose. It was on the morning of that day that she requested Professor Hoover to make out a deed of her property in Boston: "I told him that I wanted him to make it out for my Moxey"; she said she was going to surprise him on his wedding day; Moxey was present then and there when this surprising statement was made; this was about 10 o'clock or half-past; she could not remember exactly; "I was going to surprise him because we were going to be married that day." All she could tell Hoover about the description was the street and the height of the building and the granite front; she did not know the depth nor the width of the building; that had to go back to Boston and be filled in. After she told Hoover to draw the deed, she went down to the Nevada Bank for her mail and from there she went to the Palace and there met Moxey by appointment and had lunch with him at that hotel; after that meal they went to the office of Justin Gates, notary, where they found Mr. Hoover, according to arrangement, as she had told him when he had the deed ready to inform her at what time to meet him and she would come and sign; he had made it out, she supposed, on Monday morning, but she did not know; he made it out and she went and signed it when it was ready; in the notary's office she said, "Do not have that put on record until it is filled out; if you do it won't be legal; have it filled out before it is put on record"; she said this to Moxey; nothing else was said; she went out; was in that office but five or ten, perhaps fifteen, minutes; no writing was done except signing the deed; Hoover did not sit down and write while she was there; he did

nothing after she arrived there; the deed was ready as soon as she entered the room; she made her remark in the presence of the notary, Hoover, and Moxey; four persons in all present including herself; she could not precisely say what was omitted, but it was all of the description from the word "bounded"; all of that was blank when she signed the deed; she gave the paper to Mr. Moxey, who put it in with his papers, and he sent it back by Mr. Hoover to Boston to be recorded; the incident in the notary's office occurred after 1 o'clock, perhaps as late as 2 that day; she could not remember that the notary said anything, but she said to Mr. Hoover, "It must not go on record until it is properly filled in"; she said, "It is not legal"; he said, "It may never go on any record"; she replied, "It must go on record as soon as it is filled in"; then she went up to the house and afterward took the train for San Jose, and there met Moxey, who had preceded her to that town, and they were married.

As to the antenuptial events of the morning of the wedding day, Justin Gates, the notary, testified that Hoover came to his office and asked him if he had any warranty deeds; the notary said "Yes"; he had blanks of that kind; this was about half-past 11 or quarter to 12 o'clock. Hoover then requested the notary to remain in his office a few minutes; this was just before the lunch hour and he consented to defer luncheon until Hoover returned, which was in about ten or fifteen minutes, when he brought with him a lady and gentleman. Gates gave Hoover the form of a deed and the latter asked him if the instrument could not be executed in blank, the former said he thought it would not be legal to do so, and that some sort of description should be given, that it would not be proper to sign first and fill in the description subsequent to the execution; the lady who gave her name to the notary as Mrs. Gage H. Phillips gave the description, such as it was, that was inserted by Hoover, who wrote the matter, filling in the blank so far as she gave the material, "Lots No. 122, 124, and 126 situated on Summer street," and from that on as now written in that blank was not in there prior to execution nor was it inserted at all in his office or in his presence; the lady made no remark only in response to Hoover that she did not know the description except so far

as given; the notary was sure that the remainder of the description now there was not in that document when it was acknowledged before him; all of the written matter was inserted by Mr. Hoover then and there and it occupied him nearly fifteen minutes; the man who was with Mrs. Phillips had very little to do with the matter; he may have said a word or two and the lady was silent, except as related; Hoover transacted all of the business with the notary, and when the former proposed to first acknowledge the deed and then fill in the description, the lady made no objection to such a course; but the notary would not have it that way, as he thought it not proper. The notary presents Hoover as the foremost figure in this scene of the execution of the Boston deed, and the professor's story of the circumstances connecting him with the affair is to be considered: Mr. Hoover testified in his direct examination that he saw Mrs. Phillips on the morning of the 14th of July, 1902, in his private office, 1327 Market street, when she asked him if he could make out a deed; he said that he could, and she said, ''I want you to make out a deed for me''; he asked her for a description of the property, and after she gave that to him, he told her that he was busy preparing to go east the next day, and he would rather she would have her attorney make out the deed, as he himself was very busy; she replied that her attorney had made out a deed for her and it would not stand of record; she asked him if he would not make out a deed that would stand and he did so; this talk took five or ten minutes; then she left the room; he made out the deed; and then again saw her in the office of Justin Gates, the notary, on McAllister street. When respondent asked Hoover to draw the deed she said she wanted to give it to Mr. Moxey; she said she wanted to deed this property to her husband and present him the deed that day as a wedding present and as a surprise to him, whereat Hoover smiled and she said, ''We are going to be married to-day.'' Hoover then told her a notary was necessary to acknowledge, and consulting the directory found that the nearest one was Justin Gates, and he made an appointment for his office, 14 McAllister street, with her, and Hoover went there between 1 and half-past 1 that afternoon. When he arrived at the notarial office he found Justin Gates and

a lady who was not Mrs. Phillips. Hoover was there not more than five or ten minutes when she came in with Moxey. Hoover told the notary that those were the parties who were to acknowledge the deed, and she signed it and that was all there was to it. Gates told her that the description of the property was not completed and it should be filled in before the deed was recorded; the notary told her that two or three times and Hoover told her so once or twice. She replied that she was aware of that fact and did not want it recorded until it was properly filled in, and they would not have any further trouble over it; at the time the deed was acknowledged before Gates the description was filled down to and including the word "bounded," Hoover wrote in the blank form and that portion of the description, the remainder was inserted afterward, as she could not at that time give him the boundary lines and she cautioned him twenty times to see that it was properly filled out before recording; she did not know the boundary lines; she told him to be very sure and have every word inserted so there could be no trouble ever made with the deed, and to be very accurate and careful. After it was signed Justin Gates gave the deed to Mrs. Phillips and she handed it to Moxey, and he turned it over to Hoover, who placed it with his valuable papers—that is, Moxey's papers in the latter's office, and the next day, the 15th of July, 1902, Moxey handed it back to Hoover, asking him to have it recorded when he went East. "They" asked him if on his eastern trip he would take in Boston— he could not say which of the two made the specific inquiry—but Professor and Mrs. Moxey were both present. Hoover answered that he expected to be in Boston in two or three weeks, but he was not going direct there. He started that day, the 15th, and after visiting various places finally reached Boston. Arriving there he went up to see the property on Summer street and took an apartment opposite, about a block off, thence proceeded to the hall of records, had the stenographer take an exact copy of the deed formerly given to Mrs. Phillips, and then returned to his room and completed the description in the document he had carried from California, then took it to the courthouse and filed it for record. He received back the original

the next morning and sent it by registered mail to Professor Moxey; he did not stay long in Boston; at the request of Mrs. Moxey, he inspected the property and called on Mr. Edward Phillips and had a conversation with him about the renting of the premises on Summer street. Mrs. Moxey had told Hoover that he should go and pretend to try and rent this property, or, in other words, to investigate why her property, which was situated on such a prominent street, had not been rented for so many years—that was his reason for seeking out Edward Phillips, to whom he said that he wanted to see the vacant rooms over 122, 124, and 126 Summer street. Phillips said he would show him those over 128, 130, and 132, contiguous building, but Hoover told him he did not want these but the others. Edward said that the former was owned by his uncle, a wealthy man, and that he himself was interested in the latter. At length Hoover saw the rooms he first inquired for. He had further talk with this Edward Phillips, who evidently wanted to get rid of him, so he was impressed. He subsequently saw the same gentleman in San Francisco, at the Manhattan Hotel, and spoke with him there. Mr. Hoover testified that he had no interest in this controversy of any kind, name, or nature, financial or otherwise; had been paid nothing for his services and had no expectancy of profit or reward. When Moxey was east in the fall of 1902 he collected some money from the Krieg Company and paid it out to the workmen. After hearing respondent testify that she had spoken to him on July 12, 1902, Saturday, about making the deed, Hoover said she asked him on that day if he could make out deeds, but she did not refer to any specific property. In reference to the Boston transaction, Mr. Moxey testified that on the morning of July 14, 1902, respondent came to his room at 1327 Market street and reminded him that it was their wedding day, and said she was going to make him a wedding present of her Boston property and was going to ask Professor Hoover to make out the deed, as she was not satisfied with the Ukiah deed that was made out by the lawyer in the Call building in May; this was about 10 o'clock in the morning. They went into Hoover's office and he made out the deed; then they parted and afterward

met at the Palace Hotel, took luncheon, about half-past 12, at the noon hour, and went thence to Justin Gates' office, and as they entered the notary was opening his door to let a lady out and they found Hoover inside, who introduced them to Gates. There was a little talk about the deed, something about the description; he could not remember what for—he did not pay much attention; some dispute about the description, whether it would be legal with a part out. Moxey recalled asking her if she was willing to sign it as it was with the omission; she told the notary "yes," but she gave them to understand she did not want it to go on record that way. All this took about ten minutes; at about half-past, he imagined, they left the notary's office. She gave him the document and he handed it to Hoover. Moxey and respondent went to the street-car, where he saw her on, and himself proceeded to San Jose for a license. Moxey met respondent at the depot when she arrived in that city and they went straight to a justice of the peace, by whom the civil rite was celebrated which united them in wedlock, and subsequently, on the same evening, they returned to San Francisco, and he found the deed in his desk and on the next day gave it to Hoover, instructing him to have it recorded after being properly filled in; that was on July 15, 1902.

The circumstances of the evolution of the Boston deed call for criticisms similar to those applied to the Mendocino document. In neither case was she advised by her own adviser, and in the latter she was without the aid even of a practicing lawyer of any kind, but sought the service of a person not known to possess the skill requisite for a transaction involving real estate worth $200,000; the alleged reason for this singular act was that the lawyer who drew the first deed made a mistake in the description, and, therefore, she desired to have so solemn a document drawn by a man who was not a professed conveyancer, and who made out an instrument more defective than the other.

It is noteworthy that each time the deeds prepared in haste were characterized by like faults fatal to their validity. It must, however, be observed here that, although Professor Hoover did not claim to be a lawyer, nor prac-

tice as such, he possessed a certificate of admission to the bar from the United States circuit court of the northern district of Illinois, Cook county, Chicago, May 5, 1898, but no record of admission in any other court; he did not undergo an examination, but was admitted on motion of a lawyer in whose office he studied, but he did not consider himself an attorney. Hoover had been graduated as physician from the International University at Chicago, but he did not claim to be a doctor of medicine; he had, however, studied law and physic, but did not hold himself out as a practitioner in either. In regard to the instrument of conveyance drawn by him at the instance of respondent, he did not act as a lawyer, but simply to accommodate that lady and comply with her request; he could not recollect where he obtained the blank form of the deed, and he wrote in the description so far as she could give it. She did not say that it would not be valid if not filled out. Hoover thought it would be legal to fill in after execution and before recording, although the notary seemed to entertain scruples about that course. Hoover started for the east on July 15, 1902, and returned between August 15th and 20th. When he met Edward Phillips in Boston he did not give any name to him, because respondent told him not to give his real name; he did not call there upon her brothers, because she told him not to reveal his identity back there, as they might not like taking the property out of their hands, as she was dissatisfied with their management; she did not tell him that her brothers had had charge of it for thirty-five years; she said they had had it for three years and had not managed it to her satisfaction. The deed was recorded July 22, 1902, two hours after Hoover arrived in that city. When he had the talk in Boston with Edward Phillips the latter asked Hoover several times what he wanted the rooms in 122-126 Summer street for, and he evaded answering until he was compelled to; he was evasive in his responses to Phillips under the instructions received from Mrs. Moxey; he said to Phillips that the rooms might be used for storing peanuts; he did not tell him that he was going into the peanut business, but he was interested in a peanut company at that time; Phillips said it was a

very strange business for that locality, but Hoover told him it was strictly wholesale and not retail, and then Phillips thought it would be all right; of course, this peanut proposition was all in the air, so far as renting the rooms was concerned; there was no such intention in Hoover's mind. When he arrived in Boston Hoover was on the lookout for something to eat, and as he went along from the station the first place he espied was a rooming-house and he entered and hired a room; as he came downstairs he encountered in the entrance a gentleman of whom he made inquiry as to the whereabouts of the City Hall and other places in the town; this person said he had met Hoover before, that he was a traveling man and had been at his place in Colorado, and it turned out in the course of conversation that the stranger belonged to two or three fraternal orders of which Hoover was a member. He gave his name as Mr. Young and volunteered to accompany him and show him around; the proffer was accepted. Young was about five feet nine inches tall, between thirty-five and forty-five years of age, reddish hair and whiskers; he weighed about ten pounds more than Hoover. Hoover is thirty-four years old, five feet eight or nine inches in height, one hundred and fifty-six pounds in weight; barefaced; sandy complexion. Young went with him to the recorder's office; he did not remember whether he gave the deed to this man to take it in or whether he took it in himself, but he was under the impression that Young was with him and both entered together; they were always together, everywhere, in Boston and Cambridge. Hoover could not remember the initials of his constant companion who went once for the deed, but it was not yet recorded. Hoover was not sure whether he sent this Mr. Young to have the deed recorded or went himself; he trusted Young, although he had just met him that day, for "he seemed like he was a very nice gentleman"; he roomed in the same house. Hoover could not remember the name or number of the street where he had taken lodgings; he could not remember whether he paid the fee for recording before or after it was done; he remembered giving some money to Young, but did not remember whether it was for the recording fees; the fee was nominal;

he could not remember whether it was in coin or paper currency; he thought he gave a gratuity to the clerk after the recording, as that was the custom of the country in the east; he was in a hurry and he usually gave a little extra fee; he had probably chucked him a half-dollar as he had done to the others. This Mr. Young wore a mustache. He had gone two or three times at request of Hoover to obtain the deed, but it was not ready, and finally they went together and obtained it; he did not remember ever to have seen this man prior to meeting him as related. Hoover swore that he never himself assumed the name of Young, or gave that to anyone as his name.

The clerk of the registry of deeds, Frank J. Glancy, deponed that he remembered a person coming into his office in Boston some time in July with reference to a deed of Mrs. Moxey; a man of about five feet ten inches, light complexioned, about one hundred and fifty pounds, heavy, athletic build. The first Glancy noticed of him he was down in the record hall; he was talking with one of the young ladies there, and she being busy sent him up to the clerk's desk and he came and he said he wanted some one to run a title for him, and then they together ran the records back until they found a deed of property situated on Summer street, which went to Gage H. Hawkes, or Gage H. Phillips. This man then started to make a copy of the description, but, thinking it would take too long, accepted the clerk's suggestion to have a typewritten copy made, and he waited for it; it was then near noon—he came in between 10 and 11 o'clock. The clerk went to his dinner at 12, and told the man, whom he left behind, that one of the other clerks would give him the copy. Glancy did not see the man again until nearly 4 o'clock that day, when he came in and gave the clerk a deed and he was told it would cost $1.85 to record it; the man paid the fee and the clerk recorded the paper; the man asked him if he could record the deed and return it so that he could take a train to New York that night; the clerk said that the best he could do was to have it ready next day at 12 o'clock; when he took the paper this man gave his name as Young; when he came in the next day and the paper was recorded Glancy

remarked to him that there was no seal on the document, but said it could be put on then; the man put on the seal which the clerk gave him, and asked him if there was any more charge; the clerk said "No"; the man chucked him a half-dollar, and said, "Here, go and get some cigars," and taking the deed, departed. The name of the grantor in this instrument was Gage H. Hawkes, formerly Gage H. Phillips; the grantee was a Mr. Moxey, first name forgotten by the deponing clerk, Glancy.

The singular circumstance, common to the two deeds and their development, demand consideration from the court in connection with the main and controlling issue in this case, the competency of the respondent, and atone for the lack of brevity in their discussion. It must be borne in mind throughout that respondent by her acts denuded herself of every particle of property over which she had control, and placed herself entirely in the power and at the mercy of a young man, scarcely half her years, practically impecunious—certainly from his own report of slender resources and comparatively precarious prospects—with whom she had after a few days' or weeks' acquaintance become betrothed, and to whom she conveyed all her possessions, leaving herself not a modicum of her vast wealth; and all this without adequate or any advice from competent counsel or disinterested friend, and prior to her marriage. If it be said that, being betrothed to him, it was natural that she should bestow her fortune upon this youth to whom she had given her heart in troth, it may be answered that there was all the more reason for securing safeguards in the mode of transfer; for, as a learned judge has said, there is perhaps no relation in life in which more unbounded confidence is reposed than that existing between parties engaged to each other. Especially does the woman place the most implicit trust in the truth and affection of him in whose keeping she is about to deposit the happiness of her future life; from him she has no secrets—she believes he has none from her. To consider such persons as in the same category with buyers and sellers, and to say that they are dealing at arm's-length, is the acme of absurdity. If these transactions were honest in conception and execution, and not

the fruit of the conspiracy charged, common prudence should have dictated the employment of the talent and skill of an experienced conveyancer, preferably an attorney familiar with the affairs of the donor, instead of relying upon a stranger or an amateur in an art so technical. If the explanation of the respondent and Moxey be accepted that she intended the instrument as gifts to him, to whom she was engaged, ordinary sensibility and delicacy should have inspired noninterference on his part, and even the nonparticipation of his next friend and employer, Hoover, who was so active and industrious from the inception to the recordation of the Boston deed; but in neither of these transactions was there perceptible any such fine sense or respect for the proprieties which should govern the situation; and in the matter of the Boston conveyance, more particularly, which she stated expressly she designed as a surprise to her intended husband, and about which he had no foreknowledge, the evidence shows that he was present, and no act of hers in connection with either performance was accomplished without the power of his personality, and at least in one case, that of Boston, the active assistance of Hoover.

Inherent in these affairs are certain elements that may be considered as tending to establish the accusations of the petition. The fact that these deeds recite a false consideration, and purport to be deeds of bargain and sale, conveying the premises described therein for a pecuniary consideration, whereas none passed, is regarded by the law as a strongly suspicious circumstance; especially is this the case when regarded in connection with an alleged gift between persons holding relations mutually confidential and when the donor is suspected of mental weakness. The secrecy of the acts, so far as the persons upon whom the respondent would naturally rely for advice are concerned, is a suggestive feature. In all cases of this kind the element of secrecy is dwelt upon as affording strong ground for suspicion. The haste in which each instrument was prepared and executed; the excessiveness of the gift; the lack of opportunity for calm consideration and reflection, and want of time for deliberate perusal, in a matter so mo-

mentous, particularly as the Boston document, which she intended as a wedding gift, yet recites a money considera- tion and contains a covenant that she would forever war- rant and defend the title she had conveyed, and would, also, furnish an abstract up to date, this latter clause written in by Hoover, the draftsman of the whole; that the grantee virtually dictated the one deed and supervised the other, which was prepared by his intimate friend and as- sociate; his admitted influence, through her fatuous fond- ness for him over respondent,—all these and other elements elsewhere adverted to are discoverable in the circumstances of either one or both of these transactions; and in consider- ing the testimony, acts and conduct of respondent and the two professors in connection with the deeds, we must have constantly in mind their relations of intimacy and confi- dence and the natural influence of propinquity, steadily cultivated until the end was attained, the acquisition of her entire estate by Moxey prior to the marriage.

The counsel of respondent, in commenting on the evi- dence, said that every act of hers was exaggerated, and mountains were made out of molehills, and he called atten- tion to the lady herself and her conduct in court and on the stand, and her testimony exhibiting memory, will, under- standing and power of concentration, reasoning capacity, coherence, clearness of explanation, tests of competency, all of which she manifested when under examination to an uncommon degree; and counsel further alluded to the char- acteristics of insanity or incompetency, as shown in external appearances—voice, face, eyes, motions and other phenom- ena, in none of which was she eccentric, or out of the orbit described for rational beings.   In reference to this comprehensive claim of counsel, allusion may be made to the episode in the trial in which the name of Mrs. A. Lloyd Smith figured, and the total failure of memory on the part of respondent when first interrogated as to the matter.   In answer to the question at first put to her about this person, she said she did not know a Mrs. Smith or a Mrs. Jones; there had been no allusion by the examiner to the latter name; she said she had never met a Mrs. Lloyd Smith who lived at the Palace Hotel; she did not remember going to

that place to meet a lady there; she had never been introduced as a Mrs. Gage in the Palace parlors to a lady who had oil stock for sale; she repeated that she never knew a woman by the name of Mrs. Lloyd Smith. Respondent was firm as to the fact that she never met and did not know such a person; but, subsequently, petitioner applied upon an affidavit for an order to examine upon commission to Seattle a Mrs. Lloyd Smith, said to reside there, and that person having been found, her deposition was taken and read in evidence, from which it appeared that the substance of the matter recited in the affidavit was true. Mr. Moxey was present in Seattle at the time of the taking of this deposition, and he afterward testified in this court confirming the essential features of the Smith story. After that, when respondent was recalled to the witness-stand, she said that she had not remembered when she was under examination a short time previously that she had ever met or known Mrs. Smith, but after her testimony was over for that day Moxey reminded her of the incident of meeting the woman, and then she recalled the visit to the Palace, but she could not recollect what conversation occurred; something was said about oil stocks—she could not remember what. Mrs. Smith did not impress her and she never thought of her again; she had heard her spoken of since this case began,—indeed, lately she had heard nothing but Mrs. Smith. She denied point blank that she had ever told Mrs. McWilliams or Mrs. Shipman that Mr. Moxey had spoken to her of a Mrs. Smith, a very wealthy woman, who was very much in love with him and who wanted to marry him if respondent did not do so; she did not say to either that Moxey told her that this Mrs. Smith lived in New York and was quite wealthy, and that she wanted him to marry her and take charge of her property, and that if respondent should not marry Moxey he would marry Mrs. Smith, nor did she say that she loved Moxey and did not want to lose him, nor did she say to either that she had met this Mrs. Smith at the Palace Hotel; in fact, she never mentioned the name of Mrs. Smith to either of these women.

Mrs. McWilliams testified that she had made such statements, and Mrs. Shipman made a similar statement as to what respondent communicated to her on the same subject; each of the conversations with these witnesses being independent of the other. If she had such a lapse of memory as to the main event, until her recollection was revived by Moxey, is it not reasonable to suppose that she was utterly oblivious as to her conversations with these ladies, who were not hostile witnesses, in the moral sense, and to whom there is imputed no motive for mendacity. What is the inference from this evidence as to the Lloyd Smith episode? It is quite deducible from Moxey's own statement that he was making use of Mrs. Smith for some purpose in connection with respondent. He testified that he visited the Palace and called upon Mrs. A. Lloyd Smith to have the respondent see some oil stock, although the latter says she did not want any oil stock and did not buy any stock; that she only went to the hotel because Moxey wanted her to go down. He asked her if she wanted to buy any oil stock; she told him "No," she did not care for any oil stock; then he said, "Go down and see her," and they went down, as he says, not to see the oil stock exactly, but to have Mrs. Smith speak to her about some oil stock she had for sale. Mrs. Phillips did not then know Mrs. Smith and had no apparent occasion of her own to call on her. It was Moxey that induced her to make this visit on a pretext of purchasing or inspecting stock that she did not want and had no intention of buying. Moxey did not introduce Mrs. Phillips to Mrs. Smith; on this point he was positive in his testimony. Mrs. Smith talked to respondent about the oil stock; she explained all about it; he could not remember just what was said, but the substance of it was that Mrs. Smith represented to respondent that she had some very valuable oil stock which she had just secured from somebody in Oakland, and that she would let Mrs. Dr. Turman have these shares for what she paid for them.

According to Moxey's account of this interview, these were shares of oil stock, Mrs. Smith said, that she could sell for $12 a share immediately on arriving in New York, whither she was going, and she was anxious to have this Mrs. Dr. Turman show her ability. Moxey did not think that Mrs.

Smith said she wanted money to go east with, but it was in-
ferred that she wanted Mrs. Turman to sell enough stock to
go to New York with her. This meeting, Moxey testified, was
brought about by a prearrangement between Mrs. Smith and
him made on the day before; he said that Mrs. Smith was very
anxious to have Mrs. Turman go east with her and Moxey
could not purchase any stock at that time, but he told Mrs.
Smith that he had a friend who might purchase some oil stock,
as he had heard her speak of purchasing some from a party
(whose name he could not recall at the time of testifying),
and he would see this friend and bring her there, if she would
come and see the stock; he would like Mrs. Smith to have a
talk with his friend, anyway, because he did not feel that he
could explain to her the matter as capably as could Mrs.
Smith; so he said to the latter, and in that way the interview
came about. Moxey's reason for this peculiar behavior, as
given by him, was that he was anxious to aid Mrs. Dr. Turman
in her ambition to go east with Mrs. Smith. He said that this
lady doctor came to his room and told him that she had a
friend who had some very valuable oil stock that she desired to
dispose of in part, and that it was stock that would more than
double itself in ten years, and she herself wanted to go east
with Mrs. Smith, but before she could do so she had to sell
some of this stock. Mrs. Turman said to him, "Moxey, I think
it is a good thing—in fact I know it is—and Mrs. Smith is
a friend of mine and she is reliable, and I would like to have
you go down and see her," and he agreed to do so; and he
went and had the conversation already related with Mrs.
Smith, in which he arranged to bring his friend to look at the
stock. Moxey repeated in his testimony that he told Mrs.
Smith that he could not himself purchase any stock, but as he
was anxious to help out Mrs. Dr. Turman, he had a friend who
might purchase some of it, that he had heard his friend speak
of buying oil stock and he had cautioned her against it, but
he told Mrs. Smith that he thought she had a good proposition
and he would have his lady friend come down and see her.
Mrs. Smith asked him when he would come and he told her
the next day; she wanted to know in advance as, most of the
time, she would go around in her morning dress or "mother-

hubbard," as she called it, and she desired to be dressed for company when this lady should come. He did not ask her to wear any particular costume, but she said she would dress up something the way she was then, and he said that was all right. She was attired very nicely that day—had her jewels on. He notified her prior to going down with respondent; sent her a note of their approach.

In relation to Moxey's narrative of this episode, we must consider the account of the same rendered by Mrs. Dr. Turman, whom he introduced into it as the occasion for his visit to Mrs. Lloyd Smith. Mrs. Turman testified that she knew Mrs. Smith in the month of April, 1902, and that during that month, or in May, she had a conversation with Moxey concerning that lady who had oil stock to sell and who wanted her to handle it. This conversation with Moxey was in Hoover Hall, in the main office. Mrs. Turman told him that she had a lady friend at the Palace Hotel who was interested in stocks, and she herself thought they were good, but as she was ignorant of such matters, she would like to have him talk with this lady himself. Moxey said he had a friend who had money and would possibly buy, and he would bring this lady and introduce her to the other; he did not mention the name at the time. Mrs. Turman then arranged to introduce him first to Mrs. Smith, which was done, and they had two meetings before his friend was brought forward a day or two later. In the first interview when Moxey was introduced to Mrs. Smith at the Palace he said he had a friend who might buy oil stock and that he would like to bring down the following day. After that initial interview Mrs. Turman had another talk with Moxey and another after his lady friend had called at the Palace and had seen Mrs. Smith; the talk was with regard to this lady; she asked him what her name was and he said it was Mrs. Gage; he did not tell her it was Mrs. Phillips. At still another talk Mrs. Turman asked Professor Moxey if this lady was going to buy the stock and he answered "No"; that her lawyer advised her against it. Several weeks later on, some time in the early part of June, 1902, another talk was had with him and Mrs. Turman said to Moxey, "Pro-

fessor, why this was Mrs. Phillips that you took to the Palace Hotel." Mrs. Turman had seen the name on a postal card that Moxey handed her to read. Moxey laughingly said the postal card was something regarding some property and he would have more than that, or something in a boyish way, Mrs. Turman did not remember the words exactly; he admitted that it was Mrs. Phillips and when asked why he did not say so in the first place, he just laughed. Prior to his lady friend going down to the Palace, Moxey told Mrs. Turman to ask Mrs. Smith to wear her finest dress and to make the best appearance possible, and also to make it appear to his lady friend that she wanted him to travel east with her as a business man, and Mrs. Turman asked him why he wanted Mrs. Smith to do that, and he replied that he simply wanted to make an impression upon this elderly lady, this Mrs. Gage, he wanted to make her a little jealous, or something of that sort, in substance, was what he said. Professor Moxey denied in toto that he had ever told Mrs. Dr. Turman that he had taken Mrs. Phillips to see Mrs. Smith, or that he ever made any communication to her concerning his business.

This episodical phase of the controversy as to the competency of respondent may be closed with a summary of the testimony of Mrs. A. Lloyd Smith, who was the central figure in the proceedings for a brief space. Mrs. Adelaide Lloyd Smith called San Francisco her home, when she deponed at Seattle, where she was found with her trunk packed ready to go east; she was not living anywhere then, but traveling, and just then staying in the northern city, detained on account of the deposition. Mrs. Smith said that she had stopped at the Palace Hotel in April and May, 1902, for about four weeks, and she had met Mrs. Moxey there on the 12th or 14th of April; it was from the 10th to the 15th, between these last dates in 1902; she was introduced by Mrs. Dr. Turman; it was Easter morning and Mrs. Smith had not met Dr. Turman for about a year or a year and a half. Mrs. Smith told the doctor that she intended to go east and was waiting to obtain the services of some one to accompany her as secretary and business manager, and Dr.

Turman said she would like to act in that capacity, but she did not have the means to procure an outfit, and Mrs. Smith offered to obtain some stocks for her to sell and thus raise the wherewithal; and she then secured stocks at a certain figure and told Dr. Turman to make the effort to sell on a commission; the latter said she would bring some people to see her in the evening, and she brought some three or four persons, among them a gentleman whom she introduced as Professor Moxey; she did not bring him; she was waiting for him and he came there by her appointment; this was in the Palace parlor; the first time was in the evening at about 9 o'clock; he was introduced by her and she asked Mrs. Smith to tell him about different investments in which she was interested; he seemed pleased with them, but said he did not have any money to invest just then, but he might have some friends who would be willing. Mrs. Smith told him that there would be a commission in it for him, and he said he did not want any, as he was doing this for Mrs. Turman's sake, so she could go east with her; then Mrs. Turman said in case that she could not go, in a joking way, it would be nice to have Professor Moxey as her business manager. Mrs. Turman said that he was a very good business man and would be a great help; that he was an honest man, she knew him and she worked in his school—in fact, she gave him a very high recommendation. Moxey was present but made no remark on this point; he said that he would call again and bring a lady and would let her know in advance at what hour; he then bade "good evening" and went away. On the following morning, when she arose, Mrs. Smith found a note under her door—it was written in lead pencil—from Mr. Moxey, in effect saying that he would bring a lady at 3 o'clock that afternoon to see her, and telling Mrs. Smith to wear her prettiest gown and all her diamonds, and particularly to praise him for his business ability; this note was signed, "Yours, Moxey," which was rather peculiar, as she had never met him before the previous evening; on account of this singular subscription from a stranger she laughed about it and showed it to Mrs. Turman, who came in shortly afterward while she was dressing. Mrs. Smith did not preserve this missive from Mr. Moxey; she destroyed it after showing it to Mrs. Turman and

to her own lawyer and commenting on the oddity of the ending from a man whom she had never met, except as stated. Subsequently, and on the same day, and before he brought this lady to the hotel, some one knocked at her door, while she was combing her hair, and when she opened the door Moxey was standing there in his bicycle suit; he had knickerbockers on, and he said he just ran up for a few minutes to explain about the note; he said that the reason why he asked her to wear her prettiest gown and all her diamonds and to praise him was that this lady friend had $10,000 to invest, and he wanted this lady to realize that Mrs. Smith was a woman of wealth, so that his friend would be more favorably impressed, and he also desired that she should say that she would be pleased to have his services as her secretary and business manager when she went east; and that she thought highly of his ability. Mrs. Smith made him this promise. Professor Moxey, in his testimony, denied that, upon this occasion, he wore a bicycle suit or knickerbockers; he says he had on his ordinary dress.

In the afternoon, at about 3 o'clock, Moxey came again and brought a lady with him, whom he introduced to her as Mrs. Gage. Mrs. Smith never saw the person before nor after, and he said that he wanted her to speak to Mrs. Gage about any investment that she might have to make as she had some money to invest. Mrs. Gage, as Moxey called her at the time, was present when this remark was made; then he sat down to one side and did not have any more to say during the interview, and Mrs. Smith says she proceeded to present the proposition for investment, and this Mrs. Gage said she would consider the matter and would let her know the next day whether she would invest or not, and then she said she would rely upon Mr. Moxey's advice, because she thought he was a fine business man and that he had good judgment. Mrs. Gage uttered this compliment herself, to which Mrs. Smith responded, "Yes," and that she herself would be very glad to engage Mr. Moxey's services as her own business adviser, as she thought that he was honest and energetic, which he did seem to her to be, and to that extent she spoke in good faith; and she added that she would be pleased to have him go east with her in that capacity, and Mrs. Smith turned to Mr.

Moxey and said: "But you could not go, could you, Mr. Moxey?" And he answered "No," that on account of his school, and as she was going so soon, it would be impossible for him to accept such an offer, and he was sorry he could not. Mrs. Smith told them that she had to start in three days. In her closing remarks, deponent volunteered the remark that the two persons did not act like lovers; neither so acted; she said it was a business transaction. However valuable the opinion of Mrs. Smith may be as to the conduct of lovers in the presence of a stranger, her evidence is sufficient to show that she herself carried out a programme in concert with Moxey, who designed it to impress and impose upon Mrs. Phillips, the respondent here, who was induced by him to assume as a surname her prenomen, thus deceiving as to her identity another person, and that other person in turn, in collusion with Moxey, and in conformity with his request, made in writing and orally, undertook to assure respondent that she had in mind to hire Moxey as a manager for her and to take him east, whereas she had no such intention, as she had already indicated to Mrs. Turman that she did not want a man, but a woman secretary; in praising Moxey to respondent Mrs. Smith said, somewhat significantly, that on that point she "spoke in good faith." The remainder of the performance, it is to be inferred, was but pretense, and the acting of the play arranged between herself and him. Mrs. Smith added that she thought he was an honest and an energetic man, which, considering her limited and peculiar acquaintance and experience with him, was a tribute to his character serviceable in estimating the value of her judgment generally.

Mrs. Smith's own impression as to the respondent and Moxey was that she did not think they had ten cents; she thought this woman was poor and did not have any money; she was dressed very plainly and she looked as if she were a book agent or something like that; withal she impressed her as a good, sound business woman; she did all the business with her. It was purely a business deal, and the colloquy was entirely between respondent and Mrs. Smith, Moxey taking no part in this conversation, but sitting apart. This business deal did not amount to anything, for the lady left,

saying she would advise with Moxey, in whom she had implicit confidence, and neither ever called upon her again, and she made up her mind there was nothing to be made out of them, as they had no means to invest; in other words, Mrs. Smith concluded she had been herself lured into an interview to foster some design of Moxey. Mrs. Smith's interest in the matter was purely to assist Mrs. Turman and to promote the sale of stock for that person's benefit, as she herself was not soliciting orders or seeking customers, being a woman of independent inherited means, and not a stock jobber; she sometimes, however, assisted others to invest their money. Mrs. Smith denied that she was influenced by the note that Moxey wrote her or by his verbal request; but it does appear from her evidence that she executed the scheme devised by him to the very letter, and that in this so-called interview with respondent Mrs. Smith did all, or nearly all, the talking in exploiting her stock project, while the lady who was there under a feigned name said next to nothing, and finally, "Good business woman, of sound common sense," as she is described by deponent, she departed avowing her dependence on Moxey.

A queer business deal this, and surely a strange basis for a judgment of commercial competency. The fact is too plain for paltering, that throughout this incident respondent was the dupe of Moxey, and Mrs. Smith was used, more or less unwittingly, to act as an accomplice, he playing each against the other. If this incident is to be taken as a test of respondent's memory, will, understanding, power of concentration, reasoning capacity, coherence and clearness of explanation, it fails in every particular to exemplify these elements of competency. She had no memory whatever on the witness-stand of Mrs. Smith or the interview until Moxey, before she again came to testify, prompted her, and readily, at his suggestion, she recited as if by rote what he told her of the occurrence. Moxey furnished her with a memory as to all the particulars that he wanted her to recollect; even then, it appears she had no volitional power, but went to see a woman whom she did not know, to talk about buying stocks that she did not want; all in obedience to the masterful spirit of a man who had secured complete dominion over such measure of mind as

she retained. As to her power of concentration, it seems that although Mrs. Smith dilated upon oil stocks, with a view to interesting her, for the space of about forty minutes, respondent could not recall what it was all about, and was not impressed and never thought again of the subject, or of its voluble expositor; she did not understand it, could not reason about it; nor was she able even under tutelage to make any coherent or clear explanation of the affair; the whole matter was a muddle to her; and yet it was an incident of importance that must have made a profound impression at the time and had left a durable mark upon her memory, if she possessed the attributes and qualities of mind claimed for her by counsel.

The marriage of respondent to Moxey followed hard upon the execution of the Boston deed; with all her worldly goods she him endowed before the knot was tied, and they hied them, each separately, to a country town fifty miles from their legal residence to be married by a squire in presence of witnesses who were strangers to them. When they returned they spent the night at his room in the Hoover hall. She swears they began to live together on the first night of the marriage, July 14, 1902; that a few days after their marriage her husband and she went to the Manhattan Hotel, on Market street, and remained there until October 1, 1902, when they went east; they went to the hotel August 1st, and between the date of marriage and that day, the 1st of August, she used to go down to her husband's room at the Hoover hall, and they lived continuously together except while he was at the redwoods. During the time that she testifies she was cohabiting with him the record shows that she was ostensibly living in July, 1902, at the Pendleton private hotel, and beginning with August 1, 1902, at the Manhattan, at each place known by the name of Mrs. Phillips, and at the latter registering in her own hand, "Mrs. Gage Phillips, Boston, Mass.," assigned to room 103-B, the latter letter meaning "breakfast," and the proprietor testified that two or three weeks later she interpolated "Moxey" above the name "Phillips." Moxey never boarded during this period in the house, nor registered there, nor spent a night there as a guest, unless he did so unknown to the proprietor, but he took his meals at the St. Nicholas and roomed at the Hoover hall, across the street, opposite the hotel, and she did

not accompany him to his meals there, although he says that they ate together sometimes in restaurants.

Moxey swore that during the whole of the time after their marriage while he was stopping at the Manhattan he stayed there with her, slept there, but did not eat there; he did not register, nor state to the hotel people that he was occupying a room there, nor speak to anyone in that hotel; he would go in there after class hours, about 10 o'clock, or later, and leave at 8 or 9 in the morning. She was not known by any other name than Phillips at the hotel nor at the Hoover hall, nor anywhere else, nor did he live with her where it was openly known that she was his wife, nor did he publicly acknowledge her as such, prior to the institution of these proceedings, when he was forced to come out into the open; before that only Hoover knew of the fact and, perhaps, one or two others; he could not name one other with certainty. How long this secrecy would have continued we may conjecture. He had all her available property and her good name was in his keeping, which he was, by his furtive visits to her sleeping apartment after nightfall, emerging therefrom each morning, endangering, while he was indefinitely postponing the publication of her lawful relations to him.

Marriage is in itself such an honorable institution that the chief magistrate of this republic denounces the man or woman who deliberately avoids it as a criminal against the race, who should be an object of contemptuous abhorrence by all healthy people. Why, then, should Moxey, the man, subject this respondent, the woman, who had given everything of value she possessed, to the reproach of clandestinely contracting and then conniving at the concealment of so sacred an obligation and so dignified a relation? Was it not due to her name and fame, to every sentiment of honor and sense of propriety, that it should be made known at once and universally? The first person, and the only person, to whom it was revealed was Hoover. Not one of the other familiar friends of respondent was informed of it until the exposure of the lawsuit. No sound reason has been given for the secrecy characterizing this marriage. Naturally, the woman, if free to exert her will, would be proud to proclaim her change of status, if it were true, as asserted in this case, that it was a love match.

But respondent says that she did not make public the fact of her marriage, but kept it a secret for some time, and that as late as the last of July, 1902, she went down to San Jose to look into the records of marriage licenses; her cousin was with her, but she had not told that lady of the marriage, making the trip on some other pretense. Why she wanted to inspect the license, unless she distrusted the legality of the ceremony, is not clearly explained, for she testified that she saw the marriage license on the day of marriage and had told Mr. Moxey that her place of residence was Los Angeles; that it did not make any difference what part of California was put down, as she lived everywhere, and he might as well insert the southern city as any other; which, considering the migratory habits of the lady, was a correct statement of her domiciliary status, from her point of view; but it does not satisfy the mind of the investigator who has a right to know why these persons of lawful age, free from parental control or surveillance, should run away from where they were well known, and where the husband, at least, had a legal domicile, and engage clandestinely in marriage. If he were honest in his intentions and faithful in his purpose, and reciprocated her ardent avowals of affection, why did he shirk and shun publicity and go covertly to the country to consummate the contract? Why did he not voluntarily and before the compulsion of litigation extorted his secret, and in sight of men and women, acknowledge this lady to be his true wife of whom he would never feel ashamed? She had surrendered herself in body, soul and estate, had given into his hands and power her life and fortune and honor, and he professed to love her, and had described their engagement as a love match, as a match founded upon love into which convenience or money considerations do not enter, accepting as his own the dictionary definition, and asserting that he had no selfish or sordid sentiment and that his wife was similarly attached to him. This chivalric claim on his part is somewhat salted by the circumstances of the case at the time of the marriage, for then he had acquired all her material wealth, so far as it was subject to her disposition, and she was poor, except in the abundance of his plighted love, in which there was no taint of meanness or base alloy. His own conduct, however,

casts some doubt upon his assertion of unselfish devotion to his bride, and gives countenance to the charge that the marriage was mercenary on his part, and the ceremony contrived as a clincher to secure his hold upon the fortune he had by artful and crafty devices secured from her.

Such marriages are abhorred in equity, and not favored otherwise where the surroundings point to an unworthy motive and the conduct of the party who is pecuniarily benefited suggests insincerity or bad faith, and indicate that he has taken an undue advantage of the other's weakness of will or confidence in him, springing from intimacy of relation.

Censorious comment in a judicial opinion is deprecable, unless the censure is called for imperatively by the facts, and when so demanded no court should refuse to respond to the challenge of its duty and impress its stamp of condemnation upon the conduct of the male party to this marriage in subjecting the female, whom he said he loved, to the hazard she ran while receiving him privily in her bedroom in a hotel where she was registered and known as a single woman. The respondent, always anxious, apparently, to shield her beloved, says that he did not eat at the Manhattan because he did not like the proprietor; but he came there to sleep. Why he did not like the proprietor does not appear; but it might be surmised if the worthy boniface found him slipping out of her room in the morning, his dislike would have been intensified. If his motive were not mercenary and merely to fasten his grip upon her wealth by keeping her mind and will in servient subjection until he should have completely accomplished his purpose of acquisition, why did he live this life of duplicity and deception and impose upon her, whom he had promised to love, cherish and protect, the ignominy and humiliation of being suspected as a wanton or detected as a deceiver. She was an honest woman, and obeying her impulse, if she had had control of her will, could never have submitted to this condition of concealment and deception; but ''because she loved him'' and confided in him absolutely, she was prevailed upon to act a lie every day until the climax came. On his part every legitimate inducement would seem to spur him to immediate announcement of an event so fraught with his own welfare and her happiness; an event which ex-

alted him from the depression of poverty to the height of opulence; which rescued him from the hard necessity of trudging about the country seeking employment, as had been his wont, and elevated him to a plane of power and wealth— no longer a hireling but a master. It is unaccountable, upon any rational and honest hypothesis, why this man acted in this manner; but he admits that he did keep the marriage a secret, and she says, "I did not tell a soul, not a person, not even my own cousin, of the marriage." This cousin was Mrs. Hamilton, with whom, as has been seen, she went to San Jose to search the marriage license records, about two weeks after the event, and to whom she made no communication of the real object of her journey, but led her to believe she was still a single woman. In reality, it may be safely said that these parties did not from the first cohabit as man and wife. While they may have been ceremonially united, they failed to follow up that rite by living together as husband and wife and affording public evidence of that relation.

This was their duty to themselves and their obligation to the State. So far as the immediate interest involved is concerned, it matters little compared with the interests of organized society; for marriage is more than a contract—it is a status; it is an institution of society and its foundation; it does not come from society, but contrariwise; it is the parent of society, and it is supremely important that its stability shall be secured, and that its contraction should be surrounded with safeguards and its sanctity upheld; and every solemnization of marriage should be in the face of the public; there should be no secrecy either in ceremony or in connubiation; and, in this case, there is no excuse, morally or legally, for a variation from the rule thus stated and approved by the courts of this land and every civilized country. The paltry subterfuge that this young husband did not eat with his elderly wife at the Manhattan Hotel because the keeper was obnoxious may have deceived the simple soul of the trusting spouse, but it cannot be accepted as sufficient by anyone less credulous and confiding. Moxey says that he frequently took meals at the Palace with her and that they both liked the living at that hotel. Why, then, did he not take up his abode there with her? Certainly the tariff was not beyond

his income as derived from her bounty, and the associations were presumably as agreeable as at any of the other hotels and boarding-houses where she and he were sojourning. It is no strained inference to conclude that he had no serious intention of permanent cohabitation with respondent.

In attempting to account for the transfer of her property to Moxey, it is argued that, in addition to her affection for him, she was alienated from her daughter because of the latter's conduct, and that the disposition of this only child is shown to be unfilial and to justify her mother's action; that this unnatural trait is exhibited in the deposition of the daughter taken in Boston, containing reflections upon her mother. It is true that the mother's lack of judgment and the fact that she was always considered peculiar and odd about home, and the incident of an apparent attempt at suicide, when the daughter was a child of six—that is, about twenty-one years ago—at the time the respondent threw herself out of her carriage on the Floating bridge into the river, when the coachman pulled her out by the hair of her head, and the visits to the sanitarium, where her mother was confined for five years, and certain instances of improvident and aimless purchases, and other incidents manifesting strange caprices and inconsistencies and eccentric conduct at meals, which in a woman of almost abstemious habits were hard to reconcile with reason, are dwelt upon in the deposition, yet there is nothing intemperate in the recital of the deponent, and no adequate warrant for accusing her of unnatural feelings or of malice toward her mother. So far as her agency in the promotion of this proceeding is concerned, this court conceives that it was her bounden duty, for her own sake and that of her child, to set on foot an investigation as to the facts in the case and the condition of her mother's mind and the character of the people constituting her environment when she parted with all her possessions and married the man who had previously absorbed her property.

In the course of her testimony the respondent stated that it was not through love or care for her that this inquest was instituted, but that the object was simply to secure her property for the ultimate benefit and enjoyment of her daughter, as her sole heir. If the daughter were actuated alone by a motive

of self-interest, it was her duty to protect her expectant patrimony from waste or spoliation through her mother's imbecility, or through the fraud of a stranger who had obtruded into her heritage; this was her duty to her own child; but, moreover, it was her duty to her mother herself to save her from the consequences of what she had reason to believe was a conspiracy of irresponsible and unconscionable knaves. Whether she was just in her suspicions or not, is not to the purpose; she may have proceeded upon false or insufficient premises; but, apart from any sentimental considerations, it was her imperative obligation, devolved upon her by nature and by law, to prosecute this investigation and by every legal means to ferret out the facts and establish the truth. Respondent's attitude of antagonism toward her daughter is a matter of recent revelation and based upon an assumption that the latter has been guilty of acts and utterances manifesting unfilial feeling and selfish design, which imputations are not supported by the record; but the correspondent with her child shows that the mother had until very lately not harbored such delusion.

Respondent in her letters to her daughter expressed herself in an affectionate strain toward both the son in law, Mandeville, and his wife, whose former husband was not then so well regarded as now by the mother in law. These letters may be read in connection with the testimony of respondent, and tend to sustain the theory that her present state of mind was either the result of a delusion developed after this controversy began, or she consciously falsified in her explanation of her feelings toward her daughter, and that this was due to the malign influence unduly exercised over her mind by Moxey; and it is, in itself, evidence of mental weakness. It appears that, prior to these proceedings, she had entertained strong sentiments of regard for Mandeville and wife, and no great liking for the latter's first husband, which is shown by an extract from one of those letters, in which she advises her daughter of her fear that Fred Olsson might kill Harry in case they attempted to secure the child Thorwell, the son of the first marriage, from him. Respondent in this letter says to her daughter: "You and Harry live for each other; you have a pretty little home and Harry loves you. Now live

for yourself and Harry." In view of this evidence of interest and affection, respondent's present animosity is not to be treated as her spontaneous thought, much less her rational judgment, but is the offspring and echo of some one interested in estranging mother and child. According to the authorities, sudden and groundless suspicion of the affection and fidelity of tried and trusted relatives and friends is a common symptom of unsoundness of mind; and so, too, are hastily conceived affections for and confidences in mere strangers and newly made acquaintances. These remarks apply to this case.

As to these newly made acquaintances, counsel for respondent remarks that the conduct of Hoover with regard to the Boston deed was fair and open, and that the transaction in the notary's office was above board. It seems to this court that the testimony of the notary bears all the earmarks and indicia of truth, and his recital of the occurrences in his office is credible. Professor Hoover did not impress the court as a frank and candid narrator of incidents and events in which he was so intimately concerned as to call for the utmost fairness and openness. The court has no concern with his career, except as it is connected with this case, but his failure to recollect at first so important a matter as how he came to be admitted to the bar and his confusion of memory or knowledge as to state and federal courts in the place of his admission, and the obscurity surrounding that incident in his life, occurring so recently as May 5, 1898, which took place without any previous examination as to qualifications in any court is, to say the least, remarkable in a man holding so many degrees and diplomas which should import the possession of understanding and memory more than is allotted to common mortals; but his testimony generally was not characterized by candor, nor by ordinary powers of recollection.

His own account of the fabrication of the Boston deed is neither clear nor consistent with itself, nor with the statements of the others connected with it; it is in utter and irreconcilable conflict with the account of the notary, who took the acknowledgment, as to what occurred in that office. Although Hoover secured a blank from Gates, he does not remember where he obtained it; he does not know why he obtained a warranty deed; he failed totally to recall where he wrote out the deed,

The notary testified that it was filled in his presence in that office by Hoover.

Other items might be cited to show that he was either evasive in his recital or infirm in his memory. He was effusive in his comment upon the competency of respondent, who was one of the brightest women he ever knew, and thoroughly competent, in his opinion, yet he says she told him twenty times, at least, on the morning after the execution of the instrument, and in the notary's presence, to be sure and fill out the deed before placing it on record. He dwells upon the frequency of this admonition, as if it were proof of her great intelligence; but there is an incident to be explained at this point: The deed was executed on July 14th, at about noon. Moxey gave Hoover the instrument and he says he placed it among that person's papers; but on that very evening Hoover was to take the train for the east; he said he had been preparing to go ever since November, 1901, but he was not ready until this date; he missed the train; whether or not he had the deed in his pocket which she had admonished him about he does not say; but he succeeded in starting next day, the 15th, with fresh cautions from her not to forget to fill it out before recording and to adopt an assumed name in Boston. The story of Hoover's adventures in Boston, as told by himself, is sufficient to show that he has no high estimation of the virtue of veracity; it was not, as counsel for respondent argues, fair and open; it was all through the reverse; it was disingenuous and deceitful; and his own statements on the stand impressed the court unfavorably as to his candor and directness. He admits that he was evasive and equivocating in his conversation with Phillips, the nephew of respondent; he evaded giving any name to him, and told a falsehood as to the purpose for which he pretended to want the Summer street stores; he gave a false name to the clerk, Glancy, in the recorder's office; he hid himself in a by-street to keep out of view of respondent's relatives; in his evidence he invents a man named "Young," who was his guide around the city of Boston, and whose description in almost every respect corresponds to his own—his counterpart or double, as it were. Glancy described the man, who gave him the paper and took it away, to fit Hoover, and he says there was only one man,

and he gave the name of Young; as to this there can be no doubt that Hoover prevaricated in his testimony. Hoover disclaims interest in this case, yet his activity is abnormal in assisting the cause of his pupil teacher Moxey, and it is undeniable from the inception of the Boston deed, whatever doubt charity may suggest as to his connection with the Mendocino matter. In the subsequent proceedings, if he was interested no more than he declares, then he was gratuitously part and parcel of the entire scheme from beginning to end.

Many minor matters might be alluded to, to connect Hoover and Moxey with the common design to fleece respondent and to demonstrate that they were acting in concert, but this opinion has attained to dimensions that call for curtailment, necessary as it has been to deal in detail with the more important features of the case.

There is but one topic left, and that is what is usually termed opinion evidence, the least worthy, in the estimation of those who are engaged in the examination of witnesses and who are charged with the duty of weighing and determining their testimony, of any species of proof. The counsel for respondent claims credit for the class of witnesses produced by her, intelligent and responsible citizens, such as Val. Schmidt, Henry Boyle, Mrs. Pendleton, George A. Woolrich, banker; Adolph Hirschman, jeweler; Mrs. Irene D. Reeves, and others of equally high character, all of whom agree in their conclusion as to her competency; and counsel contrasts these ladies and gentlemen with the astrologers, palmists, fortune-tellers, bellboys and other local habitants who had testified to peculiarities and acts of this lady which to them signified incompetency. Of course not all of the witnesses who testified that they thought respondent was incompetent were subject to this invidious and diminishing discrimination, for some were quite up to the standard raised by counsel, such as Mr. Carothers, of Ukiah, a lawyer of good standing, and long and intimately acquainted with respondent, knowing her professionally and socially for years; Mr. Horr, of the same place, and others here and there whose observations and opinions are entitled to equal consideration with the very worthy persons named; but no matter how numerous on either

side such witnesses may be, experience teaches this court they may be produced by the score for and against the issue, all honestly testifying to contrary impressions concerning the same person whose competency is in question, they cannot change the facts brought out in the course of this long and complex controversy. Such opinions courts receive in evidence and may be taken into consideration, but they are not entitled to as much weight as facts, especially where there is a conflict between them, for when a fact is established it is a fact and cannot be overcome, while an opinion is but an opinion, and it may be true or false in its inference; and, as we have seen by the testimony of this class of witnesses, their opinions are often diametrically opposed even when based upon the same premises; and so to introduce a witness here to give an opinion that respondent is competent, and to ask the court to accept it as against the conduct of that lady, is to make too violent a demand of one whose duty it is to decide according to law and facts and not substitute for his judgment the opinion of any other person, however intelligent or honest in intent.

The claim in this case is that the respondent is incompetent; that she is incapable of taking care of herself and her property, and likely to be imposed upon by artful and designing persons, and that claim is, in the judgment of this court, fully made out.

Petition granted.

### FINDINGS.

The above-entitled cause, having been regularly tried before the court, sitting without a jury, no jury having been demanded by either of the parties thereto, upon the verified petition of Harry Lester Mandeville, hereinafter designated as the plaintiff, for the appointment of a guardian of the person and estate of the above-named Gage H. Phillips, also known as Gage H. Moxey, as an incompetent person, hereinafter designated as the defendant, and upon the answer of said defendant to said petition, the said plaintiff appearing by his counsel, Messrs. Bishop, Wheeler & Hoefler, L. M. Hoefler, William Rix, E. M. Rea and C. W. Cobb, and the said defendant having been produced at the said trial and hearing and

having appeared personally, and by her counsel, Messrs. Truman and Oliver and S. V. Costello, and the court having heard the said amended petition and said answer thereto, as well as all the evidence introduced by the said plaintiff and defendant, respectively, in said cause, and the arguments of their counsel, and having duly considered the said amended petition and answer and the said evidence and arguments, and being fully advised in the premises, now here makes and files its findings of fact, conclusions of law and decision in writing in said cause as follows:

### FINDINGS OF FACT.

The said court finds the facts in said cause to be:

1. That the said plaintiff, Harry Lester Mandeville, is the son in law of the said defendant, Gage H. Phillips, also known as Gage H. Moxey.

2. That the said defendant, Gage H. Phillips, also known as Gage H. Moxey, is, and at all the times mentioned in these findings was an incompetent person, over the age of fifty-six (56) years, and residing at and in the city and county of San Francisco, and mentally incompetent to manage her property, and incapable of taking care of herself and of managing her property, and is, and at all of said times was, by reason of disease and weakness of mind, unable unassisted to properly manage and care for herself or her property, and that, by reason thereof, she, the said defendant, Gage H. Phillips, also known as Gage H. Moxey, would be, and at all the times aforesaid was, and now is, likely to be deceived and imposed upon by artful and designing persons, and in truth has been deceived and imposed upon by artful and designing persons as in findings 3, 4, 5, 6 and 7 herein more particularly set forth.

3. That some time prior to the month of May, 1902, the said defendant being then the owner in her own right of certain real property situated in the county of Mendocino, in the state of California, consisting of about two thousand four hundred (2,400) acres of redwood timber, worth about twenty-four thousand dollars ($24,000); and also of a parcel of land in the city of Boston, in the state of Massachusetts, upon which was erected a four-story granite front store, and

known as Nos. 122, 124 and 126 on Summer street, Boston, of the value of two hundred thousand ($200,000) dollars, was residing in the city and county of San Francisco in said state of California, as an unmarried woman, being the divorced wife of one Harrison F. Hawkes.

4. That at the time last aforesaid, to wit, some time prior to the month of May, 1902, one John D. Hoover, was conducting in the said city and county of San Francisco, the Hoover University of Physical Culture, and had in his employ one Oliver N. Moxey, an unmarried man of the age of twenty-nine (29) years, or thereabouts; that the said Hoover and the said Moxey then and there conducted classes for the teaching of physical culture in said city and county of San Francisco, in the university aforesaid, and were professors thereof, teaching pupils therein, and that the said defendant at said time last mentioned, to wit, some time prior to the month of May, 1902, began to take lessons in physical culture in the said Hoover University of Physical Culture, and thereby then and there met and formed the acquaintance of the said John D. Hoover and the said Oliver N. Moxey.

5. That the said John D. Hoover and the said Oliver N. Moxey, after the said defendant had formed their acquaintance as aforesaid, learning of her (the defendant's) mental weakness aforesaid, and learning also that she (the said defendant) was possessed of large means and was the owner of the real property in finding 3 herein described, with the design and intent of deceiving and imposing upon the said defendant and of acquiring her (the said defendant's) real property, and of defrauding her out of the same, and intriguing, contriving and designing to take undue and unlawful advantage of the said mental weakness of the said defendant, and to defraud her (the said defendant) out of her said property, as aforesaid, confederated and combined together to effect their said purpose, and in carrying out their said scheme and design proceeded as follows, to wit: That it was agreed upon between them, the said John D. Hoover and the said Oliver N. Moxey, that the said Oliver N. Moxey should pretend to pay his attention to the said defendant with the view of marriage, and that he, the said Oliver N. Moxey, should induce her, the said defendant, to voluntarily convey to him, the said

Oliver N. Moxey, as a gift, the real property aforesaid; that, thereafter, to wit, on or about the twenty-third day of May, 1902, the said Oliver N. Moxey, having become engaged to marry the said defendant, induced and persuaded her, the said defendant, to deed over to him, the said Oliver N. Moxey, without consideration, the said real property situated in Mendocino county, California, as in finding 3 herein set forth, and thereupon and on the said twenty-third day of May, 1902, he, the said Oliver N. Moxey, caused to be prepared a certain deed of that date, conveying to him, the said Oliver N. Moxey, the said last-mentioned property for the purported consideration of ten dollars ($10), gold coin of the United States; that in fact no money or other good or valuable consideration whatever passed from the said Oliver N. Moxey to the said defendant; that the said defendant, acting under the influence and control of the said John D. Hoover and the said Oliver N. Moxey, and not otherwise, then and there signed and acknowledged said deed of said last-mentioned premises; that thereupon the said Oliver N. Moxey caused said deed to be recorded in the office of the county recorder of said Mendocino county, and thereafter exercised full control over the said property so conveyed to him by said deed, and shortly thereafter mortgaged the same for the sum of five thousand dollars ($5,000), gold coin of the United States, which he, the said Oliver N. Moxey, appropriated to his own uses; that thereafter, in further pursuance of said scheme and conspiracy to defraud the said defendant, the said John D. Hoover, confederating and combining with the said Moxey as aforesaid, prepared in his, the said John D. Hoover's, own hand a deed of said Boston property, described in said finding 3, purporting to convey said last-mentioned property from the said defendant to the said Oliver N. Moxey, in consideration of the sum of twenty dollars ($20), in gold coin of the United States, but, in truth, no good or valuable consideration whatever passed from the said Oliver N. Moxey to the said defendant; that with the said deed so prepared by the said John D. Hoover, he, the said John D. Hoover, accompanied the said Oliver N. Moxey and the said defendant to the office of a notary public at and in the said city and county of San Francisco, and thereupon the said defendant, acting under the

influence and control of the said John D. Hoover and the said Oliver N. Moxey, and not otherwise, signed and acknowledged said last-mentioned deed to said Boston property, and delivered to said John D. Hoover the said deed so signed and acknowledged; that thereafter on the same day, the said Oliver N. Moxey accompanied the said defendant to the city of San Jose in said state of California, and was then and there married before a justice of the peace in said city of San Jose, solely with the intent on the part of the said Oliver N. Moxey, acting in conjunction with the said John D. Hoover, of perfecting the scheme, plan and design theretofore formed between the said Oliver N. Moxey and the said John D. Hoover for the purpose of obtaining the property of the said defendant, described in said finding 3, and of defrauding her, the said defendant, of her said property as aforesaid, which said property constituted the entire property of said defendant subject to her control; that after the marriage aforesaid, the said John D. Hoover took said last-mentioned deed to the said city of Boston and caused the same to be there recorded in the public records.

6. That at all times after the said defendant formed the acquaintance of the said John D. Hoover and the said Oliver N. Moxey, as heretofore in these findings set forth, the said John D. Hoover actively promoted the pretended suit of the said Oliver N. Moxey for the hand of the said defendant by impressing upon her, the said defendant, the great love and affection which the said Oliver N. Moxey professed for her, the said defendant and in furtherance of the conspiracy, and to carry out the design and purpose of the said John D. Hoover and the said Oliver N. Moxey, heretofore in these findings set forth, they, the said John D. Hoover and the said Oliver N. Moxey sought to impress upon the mind of the said defendant the great advantages to her, the said defendant, of a marriage with the said Oliver N. Moxey.

7. That all the conduct of the said John D. Hoover and the said Oliver N. Moxey in bringing about the marriage in finding 5 herein referred to, and in inducing the said defendant to sign the deeds heretofore in these findings mentioned, was for the purpose of deceiving and imposing upon the de-

fendant, and of defrauding her, the said defendant, of the said real property in finding 3 herein described.

8. That the said defendant is still the lawful owner of all the real property in finding 3 herein described, and that the said property needs the care and attention of some fit and proper person, and that proper proceedings and suits ought to be commenced for the cancellation of the deeds mentioned in said finding 3, and for the quieting of said defendant's title to said property.

9. That it is necessary that a guardian of the person and estate of the said defendant should be appointed.

10. That the said defendant has one child, to wit, a daughter named Alice Mandeville, who is the wife of the said Harry Lester Mandeville, the plaintiff herein.

### CONCLUSION OF LAW.

And the court finds as a conclusion of law from the foregoing facts:

1. That the prayer of the amended petition herein for the appointment of a fit and proper person as guardian of the person and estate of the said defendant, Gage H. Phillips, also known as Gage H. Moxey, should be, and the same is hereby, granted.

### DECREE AND ORDER APPOINTING GUARDIAN.

The above-entitled cause, having been regularly tried before the court, sitting without a jury, no jury having been demanded by either of the parties to said cause, upon the verified amended petition of Harry Lester Mandeville for the appointment of a guardian of the person and estate of Gage H. Phillips, also known as Gage H. Moxey, therein alleged to be an incompetent person, and upon the answer of the said Gage H. Phillips, also known as Gage H. Moxey, to said amended petition, the said Harry Lester Mandeville, petitioner herein, appearing by his attorneys and counsel, Messrs. Bishop, Wheeler & Hoefler, L. M. Hoefler, William Rix, E. M. Rea and C. W. Cobb, and the said Gage H. Phillips, also known as Gage H. Moxey, the alleged incompetent aforesaid, having been produced at the hearing and trial and having appeared personally, and by her attorneys and counsel, Messrs. Truman

and Oliver and S. V. Costello, and the court having heard the said amended petition and said answer thereto, and the evidence produced by the said petitioner and the said alleged incompetent, as well as the arguments of their respective counsel, and having duly considered the same, and being fully advised in the premises, thereupon made and filed its findings of fact, conclusions of law and decision herein, in writing, in favor of the said petitioner and against the said alleged incompetent, and it appearing to the satisfaction of the court that all the averments of the said amended petition are true, and that petitioner is entitled to the relief prayed therein:

Now, therefore, it is by the court hereby ordered, adjudged and decreed that the said alleged incompetent, Gage H. Phillips, also known as Gage H. Moxey, is, and at all the times mentioned in the amended petition aforesaid was, an incompetent person, and at all of said times was mentally incompetent to manage her property, and incapable of taking care of herself and managing her property, and that by reason of disease and weakness of mind the said Gage H. Phillips, also known as Gage H. Moxey, is, and at all the times aforesaid was, unable unassisted to properly manage and care for herself and her property, and by reason thereof would be, and at all of the said times was, and now is, likely to be deceived and imposed upon by artful and designing persons, and, in truth, has been deceived and imposed upon by artful and designing persons, as in said amended petition set forth; and it is by the court further hereby ordered, adjudged and decreed that the prayer of said amended petition for the appointment of some fit and proper person as the guardian of the person and estate of the said Gage H. Phillips, also known as Gage H. Moxey, ought to be, and is hereby, granted.

That said Harry Lester Mandeville be, and is hereby, appointed guardian of the person and estate of the said Gage H. Phillips, also known as Gage H. Moxey; that the said Harry Lester Mandeville be, and hereby is, required forthwith to execute and deliver to the said Gage H. Phillips, also known as Gage H. Moxey, a bond in the sum of $100,000, with sufficient sureties, to be approved by the judge of said court, conditioned that he, the said Harry Lester Mandeville, as such guardian, will faithfully execute the duties of his

trust according to law; that upon the execution and giving of such bond, as aforesaid, and the filing thereof in this court duly approved letters of guardianship, in due form, be issued out of said court and under the seal thereof to the said Harry Lester Mandeville, as guardian of the person and estate of the said incompetent, Gage H. Phillips, also known as Gage H. Moxey, and that the said Harry Lester Mandeville, petitioner, be awarded and paid his costs herein out of the estate of said incompetent, such costs to be taxed hereafter in due course of the administration of the estate of said incompetent.